******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

KIM MILLER *v.* DEPARTMENT
OF AGRICULTURE ET AL.
(AC 37527)

Lavine, Keller and West, Js.

*Argued May 10—officially released September 13, 2016*

(Appeal from Superior Court, judicial district of New
Britain, Schuman, J.)

*Frank T. Canace*, for the appellant (plaintiff).

*Gail S. Shane*, assistant attorney general, with whom,
on the brief, was *George Jepsen*, attorney general, for
the appellee (named defendant).

*Scott R. Ouellette*, for the appellee (defendant town
of Hamden).

*Opinion*

KELLER, J. The plaintiff, Kim Miller, appeals from the judgment of the Superior Court dismissing her appeal from the final decision of the defendant Department of Agriculture (department),[1] to uphold, pursuant to General Statutes § 22-358, two disposal orders of an animal control officer of the town of Hamden to euthanize the plaintiff's two rottweiler dogs after they attacked the victim, Cynthia Reed.[2] The plaintiff argues that the court erred in dismissing her appeal because the Commissioner of the Department of Agriculture (commissioner), prior to adopting the recommendation of the department hearing officer, Bruce Sherman, to affirm the disposal orders, overlooked "a severe deprivation" of her rights by the hearing officer. The plaintiff claims that the hearing officer violated her constitutional rights to due process and to confront the witnesses against her, acted arbitrarily and capriciously in rendering his proposed final decision, and made his decision upon unlawful procedure. See General Statutes § 4-183 (j) (3) (Superior Court may overturn administrative decision "made upon unlawful procedure").[3] More specifically, the plaintiff claims that the hearing officer: (1) violated her right under the sixth amendment to the United States constitution to confront the witnesses against her when he allowed the statements of Reed and another witness to the attack, Monique Jones, to be admitted as evidence despite the fact that they did not testify and were not available for cross-examination; (2) improperly forced one of the plaintiff's witnesses to leave the hearing before testifying, thereby depriving the plaintiff of due process; (3) issued a proposed final decision that was made upon unlawful procedure because the department lacked written rules of procedure that applied specifically to hearings on dog disposal orders; and (4) acted arbitrarily and capriciously when he "interjected his opinion" about a substantive matter while questioning a witness for the plaintiff. We affirm the judgment of the trial court dismissing the plaintiff's appeal.

The following facts and legal conclusions, as set forth by the commissioner,[4] are relevant to this appeal. On October 16, 2012, Hamden animal control officer Christopher Smith issued disposal orders concerning two dogs owned by the plaintiff. The disposal orders were based upon an October 3, 2012 incident in which Reed sustained bite injuries from the two dogs outside of her residence in Hamden. After the two dogs escaped from their fenced enclosure located at the plaintiff's residence, a witness, Corey Saulsbury, saw the dogs approaching from the street on which the plaintiff resided and making a "beeline" toward a little girl, Reed's granddaughter, who began crying and screaming. The dogs first jumped on Reed's granddaughter and pawed her. Once Reed exited her upstairs apartment

on the building's exterior stairs and came down to see what was happening to her granddaughter, the dogs jumped on her, bit her, pulled her, and dragged her from the stairs, eventually dragging her across the curb, grass, driveway, and sidewalk. Saulsbury observed the dogs "pulling off chunks of [Reed's] neck and her back." At this point, Reed was on Saulsbury's automobile asking for help as the dogs pulled and bit her. Saulsbury attempted to use his automobile to hit the dogs in order to halt the attack. Later, two male bystanders retrieved a baseball bat and a pole and struck the dogs until they stopped attacking Reed and ran away. After the attack, there was blood on the driver's side window of Saulsbury's automobile, where Reed had approached in an attempt to obtain assistance. The dogs were later located at the plaintiff's residence and a fourteen day quarantine order was issued for them. After conducting an investigation, in which he concluded that Reed did not strike the dogs at all, Smith issued disposal orders.

Reed's injuries required onsite treatment by emergency medical personnel and transport to a hospital in New Haven for further treatment for dog bite injuries to her head, the back of her neck, and her back. Reed remained hospitalized until her release on October 5, 2012.

The commissioner concluded in relevant part as follows: "Because the dogs did not merely bite and release [Reed] after their physical contact with her, but continued to attack and bite her until they were physically beaten or removed from her body, it is not difficult to conclude that the injuries to [Reed] could have been even worse if these citizens did not risk their own welfare to come to her aid. The evidence in the record establishes that the attack and dog bite involving [the two dogs] that occurred on October 3, 2012, was a dangerous incident, impacting public safety.

"There was no evidence in the record to support the assertion that [Reed] somehow provoked the attack.[5] Instead, the record supports the fact that when [Reed] came down the stairs of her residence, apparently in response to the screams of her granddaughter . . . the dogs surprised [Reed] and she tried to retreat. [The dogs] immediately attacked, bit, and dragged [Reed], and [she] sustained injuries from the dog bites that required her to be transported by ambulance to a hospital for treatment for these injuries. [Reed] was admitted to the hospital for treatment from these injuries. There is substantial evidence in the record to support the notion that the attack and dog bites to [Reed] were severe.[6] There is, however, no magic to the word 'severe.' The record establishes that the attack and dog bites to [Reed] could alternatively have been called or deemed serious, or vicious, or aggressive, or any number of other adjectives. There is certainly 'a substantial basis of fact from which the fact in issue can be reason-

ably inferred' . . . . The point is that the nature of the attack and dog bites to [Reed] by [the dogs] and her resulting injuries were significant enough to justify issuance of the disposal orders, or stated alternatively, the disposal orders were appropriately 'deemed necessary' by the [t]own of Hamden [a]nimal [c]ontrol [o]fficer." (Citation omitted; footnotes added.)

After the issuance of the disposal orders pursuant to § 22-358,[7] the plaintiff appealed to the commissioner. Thereafter, a notice of hearing was provided to the parties by certified mail, which provided the time and location of the appeal and the commissioner's authority for the hearing under § 22-358 (c) in accordance with the Uniform Administrative Procedure Act (UAPA); General Statutes § 4-166 et seq.; and the department rules of practice, §§ 22-7-20 through 22-7-38 of the Regulations of Connecticut State Agencies. The applicable regulations and a copy of the department's order of procedure[8] were provided to the parties' attorneys, along with a copy of the notice of hearing. The department appointed a hearing officer, Sherman, and convened a formal administrative hearing to determine whether the orders should stand. The hearing was held and concluded in its entirety on October 23, 2013, before the hearing officer. The hearing officer issued a proposed final decision recommending affirmance of Smith's two orders. After reviewing the entire record, hearing oral argument from the parties, and considering the plaintiff's brief in response to the hearing officer's proposed final decision, the commissioner issued a final decision affirming the two disposal orders. The plaintiff appealed to the trial court, which rejected the first, second, and fourth claims she raises on appeal to this court. The trial court found "ample evidence to support the conclusion that the bites were severe and that disposal was an appropriate remedy," and dismissed the plaintiff's appeal. This appeal followed. Additional facts will be set forth as necessary.

I

The plaintiff first claims that her right under the sixth amendment to the United States constitution to confront the witnesses against her was violated when the statements of Reed and Jones were admitted as evidence by the hearing officer, despite the fact that these two witnesses did not testify and were not available for cross-examination.[9] Specifically, the plaintiff argues that the administrative hearing was "quasi-criminal" in nature, and, as such, the right to cross-examine one's accusers attaches. Therefore, according to the plaintiff, "the [commissioner] should not be able to rely on or use any statements, allegations, conclusions, etc., by Reed or Jones in [his final] decision as neither was . . . present for cross-examination." We do not agree.

The following additional facts are relevant to this issue. At the proceeding before the hearing officer, the

town of Hamden submitted as evidence statements made to the police by Reed and Jones, as well as police reports containing references to statements made by Reed and Jones about the dogs' attack.[10] Over the plaintiff's objections that such evidence was inadmissible hearsay because neither Reed nor Jones was present at the hearing,[11] the hearing officer admitted the evidence on the ground that hearsay is admissible in administrative hearings. On appeal, the trial court, *Schuman, J.*, concluded that the sixth amendment to the federal constitution was not implicated because the proceeding was not quasi-criminal in nature, and that the statements were properly admitted as reliable and probative hearsay evidence.

Our analysis begins by setting forth the applicable standard of review. "Our standard of review of administrative agency rulings is well established. . . . Judicial review of an administrative decision is a creature of statute . . . and [§ 4-183 (j)] permits modification or reversal of an agency's decision if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions are: (1) [i]n violation of constitutional or statutory provisions; (2) in excess of the statutory authority of the agency; (3) made upon unlawful procedure; (4) affected by other error or law; (5) clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or (6) arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion." (Citations omitted; internal quotation marks omitted.) *Tele Tech of Connecticut Corp.* v. *Dept. of Public Utility Control*, 270 Conn. 778, 787, 855 A.2d 174 (2004).

Under the UAPA, the scope of our review of an administrative agency's decision is "very restricted." (Internal quotation marks omitted.) *MacDermid, Inc.* v. *Dept. of Environmental Protection*, 257 Conn. 128, 136, 778 A.2d 7 (2001). "[R]eview of an administrative agency decision requires a court to determine whether there is substantial evidence in the administrative record to support the agency's findings of basic fact and whether the conclusions drawn from those facts are reasonable. . . . Neither [the appellate] court nor the trial court may retry the case or substitute its own judgment for that of the administrative agency on the weight of the evidence or questions of fact. . . . Our ultimate duty is to determine, in view of all the evidence, whether the agency, in issuing its order, acted unreasonably, arbitrarily, illegally or in abuse of its discretion."[12] (Internal quotation marks omitted.) *Okeke* v. *Commissioner of Public Health*, 304 Conn. 317, 324, 39 A.3d 1095 (2012). "We have stated that not all procedural irregularities require a reviewing court to set aside an administrative decision . . . . The complaining party has the burden of demonstrating that its substantial rights were prejudiced by the error." (Citation omitted;

internal quotation marks omitted.) *Tele Tech of Connecticut Corp.* v. *Dept. of Public Utility Control*, supra, 270 Conn. 787–88. "It is fundamental that a plaintiff has the burden of proving that the [agency], on the facts before [it], acted contrary to law and in abuse of [its] discretion . . . ." (Internal quotation marks omitted.) *Murphy* v. *Commissioner of Motor Vehicles*, 254 Conn. 333, 343–44, 757 A.2d 561 (2000).

"In addition, although we have noted that [a]n agency's factual and discretionary determinations are to be accorded considerable weight by the courts . . . we have maintained that [c]ases that present pure questions of law . . . invoke a broader standard of review than is ordinarily involved in deciding whether, in light of the evidence, the agency has acted unreasonably, arbitrarily, illegally or in abuse of its discretion." (Citation omitted; internal quotation marks omitted.) *Tele Tech of Connecticut Corp.* v. *Dept. of Public Utility Control*, supra, 270 Conn. 788. The plaintiff's constitutional claims are therefore entitled to plenary review. See *FairwindCT, Inc.* v. *Connecticut Siting Council*, 313 Conn. 669, 711, 99 A.3d 1038 (2014).

In administrative proceedings under the UAPA, evidence is not inadmissible solely because it constitutes hearsay. See, e.g., *Gagliardi* v. *Commissioner of Children & Families*, 155 Conn. App. 610, 620, 110 A.3d 512, cert. denied, 316 Conn. 917, 113 A.3d 70 (2015); see also *Roy* v. *Commissioner of Motor Vehicles*, 67 Conn. App. 394, 397, 786 A.2d 1279 (2001) ("[a]dministrative tribunals are not strictly bound by the rules of evidence . . . so long as the evidence is reliable and probative" [internal quotation marks omitted]). Additionally, a party to an administrative proceeding under the UAPA is not required to call any particular witness.[13] Therefore, the UAPA did not bar admission of and the commissioner did not err in considering the statements of Reed and Jones, the victim of the attack and an eyewitness to it, which the commissioner found to be "reliable and probative."[14] We thus turn to the plaintiff's constitutional claim.

The sixth amendment to the United States constitution provides in relevant part that "[*i*]*n all criminal prosecutions*, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . ." (Emphasis added.) The right to confrontation guaranteed by this provision is thus expressly limited to criminal proceedings. It is well established in the case law that "[t]he sixth amendment relates to a prosecution of an accused person which is technically criminal in its nature." *United States* v. *Zucker*, 161 U.S. 475, 481, 16 S. Ct. 641, 40 L. Ed. 777 (1896); see also *Austin* v. *United States*, 509 U.S. 602, 608 and n.4, 113 S. Ct. 2801, 125 L. Ed. 2d 488 (1993) ("The protections provided by the Sixth Amendment are explicitly confined to 'criminal prosecutions.' As a general matter, th[e] Court's

decisions applying constitutional protections to civil forfeiture proceedings have adhered to th[e] distinction between provisions that are limited to criminal proceedings and provisions that are not. Thus, the Court has held that the Fourth Amendment's protection against unreasonable searches and seizures applies in forfeiture proceedings . . . but that the Sixth Amendment's Confrontation Clause does not . . . ." [Citations omitted.]); *United States* v. *Ward*, 448 U.S. 242, 248, 100 S. Ct. 2636, 65 L. Ed. 2d 742 (1980) ("The distinction between a civil penalty and a criminal penalty is of some constitutional import. The Self-Incrimination Clause of the Fifth Amendment, for example, is expressly limited to 'any criminal case.' Similarly, the protections provided by the Sixth Amendment are available only in 'criminal prosecutions.' Other constitutional protections, while not explicitly limited to one context or the other, have been so limited by decision of this Court."); *Hannah* v. *Larche*, 363 U.S. 420, 440 n.16, 80 S. Ct. 1502, 4 L. Ed. 2d 1307 (1960) ("[The Sixth] Amendment is specifically limited to 'criminal prosecutions,' and the proceedings of the Commission [on Civil Rights] clearly do not fall within that category."). Our Supreme Court and this court have held likewise. See *State* v. *Anonymous*, 179 Conn. 155, 159, 425 A.2d 939 (1979) ("[t]he right to effective assistance of counsel . . . is grounded in the sixth amendment to the United States constitution, which is expressly limited to a defendant in a criminal action"); see also *In re Noel M.*, 23 Conn. App. 410, 420–21, 580 A.2d 996 (1990) (concluding that confrontation rights under sixth amendment "cannot logically be extended to . . . [parental] neglect hearing").

An appeal of a disposal order for a biting animal pursuant to § 22-358 (c) is not a criminal prosecution.[15] The issuance of a disposal order under § 22-358 (c) does not, by itself, trigger the imposition of a fine or prison term on the owner.[16] Rather, by obviating the threat that dangerous animals pose to the public, the provision is remedial and civil in nature.

The plaintiff nonetheless argues that "[s]ince the seizure and subsequent [disposal] orders [concerning her dogs] were the result of an arrest of [the plaintiff], the proceedings to determine whether [the dogs] should be destroyed were quasi-criminal, and, therefore, [the plaintiff's] constitutional rights, including her sixth amendment right to confrontation, should have been observed and protected." There are several problems with this argument. First, the record does not reveal an arrest of the plaintiff.[17] The record does reveal, however, that the town of Hamden issued infractions against the plaintiff for nuisance under General Statutes § 22-363,[18] and intentional or reckless release of a domestic animal that causes damage under General Statutes § 22-364a.[19] In Connecticut, however, an infraction is not a crime. See *State* v. *Caracoglia*, 134 Conn. App. 175, 187, 38 A.3d 235 (2012) ("An infraction is not defined as a crime

or criminal prosecution by the applicable General Statutes. [General Statutes §] 53a-24 [a] provides that 'the term crime comprises felonies and misdemeanors.' An infraction is neither."). Second, even if the plaintiff were charged with a criminal offense as a result of the biting incident, such prosecution does not automatically render criminal in nature any civil actions arising from the same incident. See *United States* v. *Ursery*, 518 U.S. 267, 292, 116 S. Ct. 2135, 135 L. Ed. 2d 549 (1996) ("[i]t is well settled that Congress may impose both a criminal and a civil sanction in respect to the same act or omission" [internal quotation marks omitted]); see also *State* v. *Burnell*, 290 Conn. 634, 641–42, 966 A.2d 168 (2009) (administrative license revocation proceeding and criminal prosecution arising out of same offense did not violate federal or state double jeopardy clauses).

Finally, with respect to the plaintiff's claim that she was deprived of her right to confront Reed and Jones, we note that the plaintiff was free to subpoena both witnesses to compel their attendance at the hearing, or, in the alternative, to request that the hearing be held open in order to afford her more time to prepare such subpoenas or to submit a request to file late any affidavits refuting their testimony. The record does not disclose that the plaintiff attempted to pursue any of these options.

We conclude that the hearing officer's admission of the hearsay statements of Reed and Jones did not violate the sixth amendment to the United States constitution and that these statements were therefore properly considered by the commissioner prior to issuing his final decision.

II

The plaintiff next contends that the commissioner erred in failing to find that the hearing officer improperly forced one of her witnesses to leave the hearing before testifying.[20] Specifically, the plaintiff claims that "a witness essential to the matter, with facts surrounding the incident . . . was forced to leave the hearing despite a medical condition that was the reason for her behavior." This claim is wholly without merit.

The following additional facts are pertinent to this issue. The record discloses that the hearing officer twice admonished Satanya Hudson, a friend of the plaintiff, for creating some sort of disturbance in the hearing room.[21] The precise nature of the disturbance is not apparent on the record. It further appears that Hudson later left the hearing room to tend to a medical condition and never returned.[22] The commissioner found that the hearing officer did not request, require, or force Hudson to leave the hearing, but merely asked that she not be disruptive, and that Hudson did not state or reveal that a medical condition caused her to be disruptive. He further found that it was not the hearing officer's

responsibility to ascertain whether counsel for the plaintiff wanted to call Hudson to testify. On appeal, the trial court concluded that there was nothing in the record to support the plaintiff's claim that Hudson was forced out of the hearing room and that, in any event, the plaintiff failed to establish any prejudice arising from the episode as no proffer by counsel for the plaintiff regarding Hudson's proposed testimony was ever made.

The premise of the plaintiff's claim is belied by the record, which is simply bereft of any indication that the hearing officer "forced [Hudson] to leave and not testify" or that she "was not allowed back to testify." Notably, at no time during the hearing did the plaintiff object by claiming that Hudson had been forced to leave or had not been allowed back to testify. Additionally, as the commissioner found, "[t]here was no request made to the hearing officer to have [Hudson] testify after a break or recess, there was no request to continue or hold open the hearing to have [Hudson] testify on another date, [and] there was no proffer by counsel for [the plaintiff] regarding the alleged nature of [Hudson's] testimony." Further, "[t]here was no request to file an affidavit regarding the nature of [Hudson's] testimony . . . and no request was made to late file such an exhibit." Thus, the plaintiff has not demonstrated that her right to due process of law was violated as a result of the hearing officer's verbal exchanges with Hudson.

### III

The plaintiff next argues that the proposed final decision of the hearing officer was made upon unlawful procedure because the department lacked written procedures that applied specifically to hearings on dog disposal orders, thereby depriving the plaintiff of due process.[23] According to the plaintiff, the hearing officer "rel[ied] solely on the codified sections of the [UAPA] . . . and the Department of Agriculture's rules of practice, both of which are *general* in nature and apply to all hearings before the department, and not *specifically* to appeals of dog disposal orders." (Emphasis added.) Thus, the plaintiff asserts, her right to due process was violated because the hearing officer lacked sufficient guidance as to how to conduct the administrative hearing. As support for this claim, the plaintiff relies on a transcript of a status conference in an unrelated case before the United States District Court for the District of Connecticut, which the plaintiff claims, shows the lack "of any written rules, procedures or guidelines used by the department . . . as they relate to the department's practices and procedures pursuant to § 22-358." This claim, including its reference to the appended transcript, is raised for the first time before this court. We therefore decline to review it.

"Practice Book § 60-5 provides in relevant part that [this] court shall not be bound to consider a claim unless

it was distinctly raised at the trial or arose subsequent to the trial. The court may in the interests of justice notice plain error not brought to the attention of the trial court. . . . Indeed, it is the appellant's responsibility to present such a claim clearly to the trial court so that the trial court may consider it and, if it is meritorious, take appropriate action. That is the basis for the requirement that ordinarily [the appellant] must raise in the trial court the issues that he intends to raise on appeal. . . . For us [t]o review [a] claim, which has been articulated for the first time on appeal and not before the trial court, would result in a trial by ambuscade of the trial judge. . . . We have repeatedly indicated our disfavor with the failure, whether because of a mistake of law, inattention or design, to object to errors occurring in the course of a trial until it is too late for them to be corrected, and thereafter, if the outcome of the trial proves unsatisfactory, with the assignment of such errors as grounds of appeal. . . . This rule applies to appeals from administrative proceedings as well." (Citation omitted; internal quotation marks omitted.) *Ferraro* v. *Ridgefield European Motors, Inc.*, 313 Conn. 735, 758–59, 99 A.3d 1114 (2014); see also *Dragan* v. *Connecticut Medical Examining Board*, 223 Conn. 618, 632, 613 A.2d 739 (1992) ("A party to an administrative proceeding cannot be allowed to participate fully at hearings and then, on appeal, raise claims that were not asserted before the board. We have made it clear that we will not permit parties to anticipate a favorable decision, reserving a right to impeach it or set it aside if it happens to be against them, for a cause which was well known to them before or during the trial." [Internal quotation marks omitted.]).

The record reveals that the plaintiff failed to raise this distinct claim before the hearing officer, the commissioner, or the trial court. The plaintiff, however, appears to argue that because the District Court status conference on which she relies took place *after* the administrative hearing, she is entitled to rely on it in the present claim. See Practice Book § 60-5. Even assuming, arguendo, that the status conference transcript supports the plaintiff's proposition, the record reflects that the department informed the plaintiff in a letter prior to the hearing that "[the] hearing will be conducted in accordance with the [UAPA] and the Department of Agriculture [r]ules of [p]ractice, [s]ections 22-7-20 through 22-7-38 as found in the Regulations of Connecticut State Agencies (enclosed)." Thus, the plaintiff had notice of what procedural rules would—and, importantly, would *not*—be used during the hearing. If, as the plaintiff asserts, "there [were] no written guidelines, rules, or procedures for parties to follow" specifically in administrative hearings on dog disposal orders, such lack of specific procedures was as apparent before the hearing as the plaintiff contends it is now. Thus, the plaintiff's claim did not "ar[ise] subsequent to the trial."

Practice Book § 60-5. Accordingly, we conclude that this claim was not preserved and we decline to review it.[24]

IV

Finally, the plaintiff argues that the commissioner erred in finding that the hearing officer did not act arbitrarily and capriciously when he "interjected his opinion" about a substantive matter while questioning a witness for the plaintiff. Because the plaintiff failed to adequately brief this issue, we decline to review its merits.

"Whe[n] an issue is merely mentioned, but not briefed beyond a bare assertion of the claim, it is deemed to have been waived. . . . In addition, mere conclusory assertions regarding a claim, with no mention of relevant authority and minimal or no citations from the record, will not suffice." (Citations omitted; internal quotation marks omitted.) *Connecticut Coalition Against Millstone* v. *Connecticut Siting Council*, 286 Conn. 57, 87, 942 A.2d 345 (2008).

The plaintiff cites to only one instance of the allegedly inappropriate interjection of opinion as follows:

"[The Hearing Officer]: So do you think if that bite to the neck coupled with dragging, dragging the victim, might be more than just flight?

"[The Witness]: Potentially. But there are a lot of variables, especially with this case here.

"[The Hearing Officer]: I understand there are a lot of variables. I was a practicing large animal veterinarian for eighteen years before I came here, and I saw plenty of attacks by dogs. And I think that there are a lot of different opinions on neck bites."

The trial court found no merit to this claim, concluding that "[a] trial judge, and presumably a hearing officer, has authority, particularly in a nonjury case, to question a witness as long as he remains neutral and does not take over counsel's role," and further noting that the hearing officer's statement was "essentially innocuous."

The plaintiff's brief does not explain how the hearing officer's statement constitutes error except to say that it is an example of his "interject[ing] his opinion rather than acting as a finder of fact," and that, from what we can discern from a section heading earlier in the plaintiff's appellate brief, it is claimed to be possibly arbitrary and capricious as well. The plaintiff cites no legal authority in support of this argument, provides no further reference to the record, and engages in no further analysis. We thus deem this claim abandoned and decline to review it.

The judgment of the trial court dismissing the plaintiff's appeal is affirmed.

In this opinion the other judges concurred.

[1] Because the Commissioner of the Department of Agriculture acts on behalf of the department, references in this opinion to the department include the commissioner.

[2] The town of Hamden is also a defendant in this appeal and has adopted the department's brief in full.

[3] Administrative hearings to consider appeals of disposal orders issued pursuant to § 22-358 (c) are conducted in accordance with the Uniform Administrative Procedure Act (UAPA); General Statutes § 4-166 et seq.; and the department rules of practice, specifically, §§ 22-7-20 through 22-7-38 of the Regulations of Connecticut State Agencies. Pursuant to General Statutes § 4-176e, hearings in contested cases in agency proceedings may be conducted before a hearing officer, who, pursuant to General Statutes § 4-179, renders a written, proposed final decision to the commissioner. After affording each party adversely affected by the proposed final decision an opportunity to file exceptions and present briefs and oral argument pursuant to § 4-179 (a), the commissioner is vested with the authority to render the final decision in matters involving disposal orders under § 22-358 (c).

[4] In his final decision, the commissioner set forth detailed factual findings of the events underlying this case, many of which were in agreement with the factual findings contained in the hearing officer's proposed final decision.

[5] Both before and during the hearing, the plaintiff maintained, with varying degrees of conviction, that it was Reed who incited the attack. In his detailed factual findings, the commissioner recounted how, following the attack, the plaintiff "told [a television reporter] that she blamed the victim for this incident." Furthermore, the commissioner recounted that "[a] Facebook page was established to save [the dogs] and [the plaintiff] testified that she wrote on that Facebook site, as did the 'Lexus Project' [an organization assisting her]. . . . [The plaintiff] was asked if on that site she wrote, 'I can't believe I have to go through all this because of one deranged woman [who] decided to attack my bab[ies].' [The plaintiff] responded, 'I may have written some of that. Lexus Project edited some. They were the managers from that page.' " (Citation omitted.) Finally, during the hearing, "[w]hen asked if [the plaintiff] thought the dog bite attack to [Reed] was [Reed's] fault, [the plaintiff] testified that she saw [Reed] being aggressive with her dogs and that 'if it had been handled differently, [Reed's granddaughter] wasn't touched at all, because my dogs are not vicious. If they were vicious they would have bit the little girl and other people, probably. It was only her. And she was the only one that went after them. And I did see that, sir.' " The commissioner found, however, that "[the plaintiff] did not observe how the initial attack by [the dogs] on [Reed] occurred."

[6] The commissioner also took note of the fact that Hamden police officer Michael Cirillo, who arrived on the scene following the attack, "[had] responded to an estimated [forty to sixty] dog bites in his career [and, based upon his observations] . . . the injuries to [Reed] were the most significant in terms of injuries he has encountered." (Citation omitted.) Similarly, the commissioner noted that Smith, who observed Reed's bandaged injuries following her discharge from the hospital, "[had] seen a couple dozen dog bites in his career as an animal control officer and in terms of injuries to the victim, this was the most severe." A video depicting Reed's injuries, also was submitted in evidence as a full exhibit.

[7] General Statutes § 22-358 provides in relevant part: "(b) Any person who is bitten, or who shows visible evidence of attack by a dog, cat or other animal when such person is not upon the premises of the owner or keeper of such dog, cat or other animal . . . shall make complaint concerning the circumstances of the attack to the Chief Animal Control Officer, any animal control officer or the municipal animal control officer or regional animal control officer of the town wherein such dog, cat or other animal is owned or kept. Any such officer to whom such complaint is made shall immediately make an investigation of such complaint. . . .

"(c) If such officer finds that the complainant has been bitten or attacked by such dog, cat or other animal when the complainant was not upon the premises of the owner or keeper of such dog, cat or other animal the officer shall quarantine such dog, cat or other animal in a public pound or order the owner or keeper to quarantine it in a veterinary hospital, kennel or other building or enclosure approved by the commissioner for such purpose. . . . The commissioner, the Chief Animal Control Officer, any animal control officer, any municipal animal control officer or any regional animal control officer may make any order concerning the restraint or disposal of any biting dog, cat or other animal as the commissioner or such officer deems necessary. . . . Any person aggrieved by an order of any municipal animal

control officer, the Chief Animal Control Officer, any animal control officer or any regional animal control officer may request a hearing before the commissioner within fourteen days of the issuance of such order. . . . After such hearing, the commissioner may affirm, modify or revoke such order as the commissioner deems proper."

[8] The order of procedure consisted of: (1) the hearing officer's opening remarks; (2) introduction of the hearing participants and witnesses; (3) the parties' opening statements; (4) documentary evidence marked for identification; (5) the municipality's case-in-chief, including (a) direct examination of the witnesses and offering of documentary evidence, (b) cross-examination by the opposing side, (c) questions from the hearing officer, (d) redirect examination, (e) recross-examination, if necessary, and (f) questions from the hearing officer; (6) the animal owner's case presentation, which would proceed in the same order as the municipality's case-in-chief; (7) rebuttal; (8) the parties' closing statements; and (9) closure of the hearing.

[9] The plaintiff also makes several assertions that are ancillary to her sixth amendment claim. We dispose of these assertions as follows:

First, as part of her sixth amendment claim, the plaintiff asserts that the hearing officer violated her right to confrontation under article first, § 8, of the Connecticut constitution. However, "[b]ecause the [plaintiff] has not set forth a separate state constitutional analysis pursuant to *State* v. *Geisler*, 222 Conn. 672, 684–86, 610 A.2d 1225 (1992), we deem that claim abandoned," and therefore proceed by evaluating the plaintiff's confrontation claim under the sixth amendment to the federal constitution. *State* v. *Benedict*, 158 Conn. App. 599, 604 n.5, 119 A.3d 1245, cert. granted on other grounds, 319 Conn. 924, 125 A.3d 200 (2015).

Second, the plaintiff appears to argue separately that the violation of her right to confrontation also deprived her of due process under the fourteenth amendment to the federal constitution, at one point stating that "the town of Hamden violated [the plaintiff's] *due process* rights to cross-examine." (Emphasis added.) Whether this is a separate constitutional claim, or merely a recognition that the sixth amendment has been applied to the states through the due process clause of the fourteenth amendment; see *Pointer* v. *Texas*, 380 U.S. 400, 406, 85 S. Ct. 1065, 13 L. Ed. 2d 923 (1965); or both, is not entirely clear. To the extent that the plaintiff relies on the fourteenth amendment, however, we view that argument, in its essence, to be the functional equivalent of her sixth amendment claim, and reject it.

Third, the plaintiff adds in passing that, by admitting statements of the two witnesses as evidence at the hearing when they did not testify, the hearing officer also violated the plaintiff's rights under the fifth amendment to the United States constitution. The plaintiff provides no further elaboration or analysis of this issue. We therefore consider it inadequately briefed and decline to review it. See *Connecticut Coalition Against Millstone* v. *Connecticut Siting Council*, 286 Conn. 57, 87, 942 A.2d 345 (2008).

[10] These items were far from the only sources of information about the attack. At the hearing, Saulsbury provided detailed eyewitness testimony about the attack. Furthermore, police officer Michael Cirillo and Smith both testified about their observations of Reed's injuries.

[11] The commissioner found that the town of Hamden, through Smith, "attempted to locate [Reed] to come to th[e] administrative hearing by going to her residence, but she did not appear to be living there, and by calling her on the phone, but the phone was not in service."

[12] Our restricted scope of review is further constrained by the fact that the legislature, by promulgating § 22-358, vested the animal control officer with broad discretion to make orders that "such officer deems necessary" with respect to "the restraint or disposal of any biting dog . . . ." General Statutes § 22-358 (c).

[13] Of course, if a witness does testify at an administrative proceeding, he or she is subject to cross-examination. See General Statutes § 4-177c.

[14] We note that during the proceedings before the hearing officer, the plaintiff objected to the statements of Reed and Jones only due to the fact that neither of them was present. The plaintiff did not argue that their statements were unreliable or not probative.

[15] In so holding, we also conclude that it is immaterial for purposes of the sixth amendment whether the disposal orders are quasi-criminal or not. As explained previously in the body of this opinion, it is well established that confrontation rights under the sixth amendment to the federal constitution are afforded only to *criminal* defendants. The cases that the plaintiff cites are inapposite because they do not involve sixth amendment claims. *Boyd* v. *United States*, 116 U.S. 616, 617–18, 6 S. Ct. 524, 29 L. Ed. 746 (1886), for instance, involved a proceeding by the United States to execute the forfeiture of cases of plate glass, which allegedly had been illegally imported without payment of the customs duty. The Supreme Court held that proceed-

ings instituted for the purpose of declaring the forfeiture of property by reason of crimes committed by the owner, though civil in form, are quasi-criminal in nature, and, therefore, under the fourth and fifth amendments, the owner cannot be compelled to produce documents that justify the forfeiture by proving the criminal violation occurred. Id., 634–35. Similarly, in *One 1958 Plymouth Sedan* v. *Pennsylvania*, 380 U.S. 693, 702, 85 S. Ct. 1246, 14 L. Ed. 2d 170 (1965), the Supreme Court held that the state could not seize evidence in violation of the fourth amendment for use in a quasi-criminal forfeiture proceeding intended to penalize the owner of an automobile for the commission of a criminal offense. In that case, police officers stopped an automobile and searched the rear and trunk without a warrant and without probable cause, ultimately finding thirty-one cases of liquor not bearing Pennsylvania tax seals, which constituted a violation of Pennsylvania law. Id., 694–95. In the present case, by contrast, the animal control officer was not required to find that the plaintiff violated any criminal law in order to justify his disposal orders under § 22-358 (c).

[16] A municipality may assess on the owner certain fees, including a nominal "redemption fee" for owners claiming a captured or impounded animal, and a payment representing the cost to the municipality of quarantining a biting animal. General Statutes § 22-333. These fees, however, merely compensate a municipality for costs incurred while impounding an animal, and thus cannot be described as punitive in nature. Compare Black's Law Dictionary (7th Ed. 1999) p. 629 (defining "fee" as "[a] charge for labor or services, esp. professional services"), with Black's Law Dictionary, supra, p. 647 (defining "fine" as "[a] pecuniary criminal punishment or civil penalty payable to the public treasury").

And, although, pursuant to § 22-358 (c), the state may punish an animal owner with a thirty day prison term and $250 fine for failing to comply with a quarantine order issued after a biting incident, such criminal penalty is distinct from a disposal order, and, in any event, is not at issue in this case.

[17] At the administrative hearing, the plaintiff's prior counsel acknowledged that the plaintiff was not arrested.

[18] General Statutes § 22-363 provides: "No person shall own or harbor a dog or dogs which is or are a nuisance by reason of vicious disposition or excessive barking or other disturbance, or, by such barking or other disturbance, is or are a source of annoyance to any sick person residing in the immediate vicinity. Violation of any provision of this section shall be an infraction for the first offense and a class D misdemeanor for each subsequent offense and the court or judge may make such order concerning the restraint or disposal of such dog or dogs as may be deemed necessary."

[19] General Statutes § 22-364a provides: "Any person who intentionally or recklessly releases a domestic animal that enters upon the real property of another person and causes damage to such real property in an amount in excess of one hundred dollars shall have committed an infraction."

[20] In a section heading of her appellate brief, the plaintiff also asserts that this alleged conduct violated her constitutional right—presumably under the sixth amendment—to call witnesses on her own behalf. Although such a claim is not adequately presented, we note that our analysis herein would also govern our analysis of such claim.

[21] The exchanges surrounding the disturbance are as follows:

"[The Defendant's Counsel]: But a witness described the way the dogs were [attacking], was like an alligator. If somebody described that to you—

"[The Witness]: Yeah, if a dog rolled on its side on a bite, that would be completely, I have never seen that. I have never—

"[The Defendant's Counsel]: Ma'am, it has been all day, and—

"[The Hearing Officer]: I'll step in here too.

"[Hudson]: I am tired. I am sorry.

"[The Defendant's Counsel]: Yeah, but this started first thing in the morning.

"[Hudson]: I am sorry.

"[The Defendant's Counsel]: I understand you may not agree with my questions, you may not agree with some of the answers, but now it is getting distracting.

"[Hudson]: I am sorry. I apologize to you, sir.

"[The Hearing Officer]: And if you want to stay in the hearing that is going to have to stop.

"[Hudson]: No problem."

Later, the following exchange occurred:

"[The Hearing Officer]: So, if you had a five year old child or four year old child out in its yard, these two dogs got loose after you, well let's say before you train them. These two dogs got loose, and they, you know, they travelled a few hundred feet, couple blocks—ma'am, one more time. This is the second warning.

"[Hudson]: I am not doing anything, sir. I am falling asleep.

"[The Hearing Officer]: As far as I can see, you are.

"[Hudson]: I didn't do anything—

"[The Hearing Officer]: Well, you know.

"[The Plaintiff]: Satanya—

"[Hudson]: Kim, I didn't do anything. I rubbed my eye and I went like this. I am falling asleep."

[22] We glean this from the following exchange between the hearing officer and Evan Wilson, who would later testify for the plaintiff:

"[The Hearing Officer]: Excuse me.

"[Wilson]: I apologize. I just need the keys to her truck. Satanya is on medication and she is having seizures, which is also the reason why she is having issues.

"[The Hearing Officer]: All right.

"[Wilson]: So I just want to get—

"[The Hearing Officer]: I apologize—

"[Wilson]: No, that's all right. That's why I went outside to go check on her."

This final exchange is the first time that a reference to Hudson's medical condition appears on the record.

[23] In her brief, the plaintiff frames this alleged error as arbitrary and capricious conduct by the hearing officer. In substance, however, this claim is one of unlawful procedure under § 4-183 (j) (3). Accordingly, we refer to it as such.

[24] In responding to her other claims, the commissioner noted: "In response to her brief, [the plaintiff] was provided with sufficient due process in this administrative proceeding. There was adequate notice of the hearing and the basis for the hearing. [The plaintiff], through counsel, was given the opportunity to cross-examine all witnesses produced by the town, to put on her own witnesses and to submit documentary evidence. . . . There was no violation of fundamental fairness to [the plaintiff]. In assessing the common-law right to fundamental fairness, courts review whether there was due notice of the hearing, that the parties had the right to produce relevant evidence and that there was the right to cross-examine witnesses produced by its adversary. . . . Again, in this case, [the plaintiff] had notice and the opportunity to participate in a fair and impartial administrative hearing. [The plaintiff] had the opportunity to present all relevant evidence in this matter. All of the documents presented by [the plaintiff] were accepted as evidence and made part of the record for the final decision maker's consideration. [The plaintiff] had the opportunity to cross-examine all of the witnesses produced by the town. [The plaintiff] had the opportunity to call any and all witnesses that she determined to present for testimony before the hearing officer. [She] was provided with the opportunity to file exceptions to the proposed final decision and argue them before the final decision maker at an oral argument prior to the issuance of a final decision." (Citation omitted.)